## Case No. 16,234.

### UNITED STATES v. SCHULER.

[6 McLean, 28.] [1]

Circuit Court, D. Michigan. June Term, 1853.

PUBLIC LANDS—REMOVAL OF TIMBER—INDICTMENT —CONSTRUCTION OF STATUTE.

1. The indictment charged the defendant with being employed in "removing from lands of the United States, at the mouth of the river Muskegon, in the county of Ottawa, and district of Michigan, a large amount of timber, to wit: one hundred thousand shingles and twenty cords of shingle bolts." The court held this description too vague and uncertain. That the locality of the trespass was inseparably connected with the offense, and the particular section or quarter section of the public domain must be stated, so as to protect the defendant from another trial, for the same offense, more particularly described according to the designations of the public survey. That the question was not one of jurisdiction; but pertained to the statutory description of the offense.

2. That the United States, as a great land proprietor, had the public lands officially surveyed, platted and designated, by fixed ranges, townships, sections, and quarter sections. These divisions were of record, and notorious, and the defendant was entitled to such a particular description that he might be apprised of what trespass he was called upon to defend. The mouth of the Muskegon might embrace more or less of the land of the United States, and comprehend townships or counties. The being "employed in removing timber from the lands of the United States," had reference to the well known and legally designated parts of the public survey, by which the national domain, other than that reserved, was purchased and sold.

3. The statute under which the indictment was found, constitutes part of the land law of the United States, and was designed for the protection and the preservation of both classes of the national domain by severe penalties. The term "other land" in the statute, has reference to its surveyed divisions, and contemplates the lands known and described in the public surveys as distinct from those reserved for naval purposes. The one was held for a special object; the other, by various enactments as trustee for subsequent purchasers. [Cited in U. S. v. Garretson, 42 Fed. 25.]

4. The term "other lands" being general, and the intention manifestly requiring a specific application, in order to charge the particular offense, a particular description was necessary as to place. The general language, "lands of the United States," not sufficient, as descriptive of the offense.

5. The term "timber" in the statute, signifies, the standing and the felled trees prepared for transportation to a vessel or saw-mill, such as saw logs, or lumber in bulk; but does not embrace any article manufactured from the tree, as shingles or boards. The trees are those, the wood of which is generally used in ship and house building.

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

6. It is not necessary in an indictment for removal, to allege that the timber was removed from the land on which it was grown or from which it was cut. But it must be stated that it was removed from the lands of the United States, specially described according to the public survey.

7. The allegation that the defendant knowingly committed the act, is unnecessary.

[Cited in U. S. v. Three Railroad Cars, Case No. 16,513.]

Mr. Hand, U. S. Dist. Atty.

WILKINS, District Judge. This indictment contains two counts. The first charges the defendant with "being employed," and the second with "aiding and assisting" in removing "timber from lands of the United States." The description of the offense is in these words: "That George Schuler, late of the village of Muskegon, in the county of Ottawa, on the 20th of June, 1853, at the mouth of the river Muskegon aforesaid, was employed in removing from lands of the United States, a large amount of timber, to wit: one hundred thousand shingles and twenty cords of shingle bolts, the property of the United States, of the value of one thousand dollars." The description in the second count, is in the same words, with the exception as "to aiding and assisting in removing," instead of "being employed to remove."

The act of congress of March 2, 1831 [4 Stat. 472], entitled "An act to provide for the punishment of offenses committed in cutting, destroying, or removing live-oak and other timber or trees reserved for naval purposes"—defines the offense as follows: "If any person shall cut, or be employed in cutting, or shall remove or be employed in removing, or aid and assist in removing any live oak or red cedar trees, or other timber, from lands of the United States, with intent to export, dispose of, use, or employ the same in any manner whatsoever, other than for the use of the navy of the United States, the person so offending, on conviction thereof, shall, for every such offense, pay a fine not less than triple the value of the tree or trees, or timber so cut, destroyed, or removed, and be imprisoned not exceeding twelve months."

Several reasons are assigned as causes of demurrer. We will notice them in the order in which they have been presented in the argument.

I. It is objected that the offense is not described in either count with sufficient certainty and precision. This objection, especially, has reference to the locality of the trespass. It is not charged that the timber was removed from any designated portion of the public domain. The language is general, "from lands of the United States at the mouth of the river Muskegon aforesaid." Where the locus in quo is so inseparably connected with the offense,—as in this statutory trespass upon the public lands,—such a description should be given, as would certainly protect the defendant from a second trial for the same offense, in which the indictment contained a more particular description as to township, range, section, or quarter section of land from which the logs were actually removed. It is not necessary to specify any of the political divisions of the state, merely as indicative of the jurisdiction of this court. It is sufficient to allege, that the trespass was committed within the district. Such an allegation is all that is necessary in most of the cases triable in the United States court. But this act of congress, (being part of the land law of the United States,) in the creation of this offense, had reference both to the naval reservation and the surveyed lands of the national domain, with the intention of preserving the timber on them from destruction, by the imposition of severe penalties. And the principal divisions and sub-divisions of the public surveys, being specially directed by statute, and of public record and notoriety, are unquestionably intended by the statutory language "other lands of the United States," in contradistinction to "the lands reserved." The usual fiction of "breaking the close" in actions or indictments, for trespass upon lands, or the necessary description in ejectment, is not designative of jurisdiction, but essentially descriptive of the particular property of the plaintiff on or concerning which the offense has been committed. The principle of the fiction is applicable to the indictment. The United States as a great land proprietor, for their preservation, protection, and sale, has had the public lands officially surveyed, and by various agencies and functionaries has had platted off and designated by fixed boundaries and sections, the national domain.

A description, then, omitting the material averment of the particular division from whence the timber was removed, is too vague and uncertain. A removal from a body of water, is not a removal from land. Such would not answer in an action for civil damages, much less then, in an indictment, which should be specially descriptive of the offense charged. An individual owning several parcels of land in the same township and county, must specify in his action, with distinguishing certainty, which one of his farms has been injured by the trespass for which he seeks reparation. It would not do, to describe the same generally as by county or townships, where such description would not specify, and where specification was necessary. The "mouth" of a river may embrace for many miles land on either side, and the land adjacent may comprehend more townships than one, it may be more or less extensive, and the lands on its banks or borders be varied as to ownership. In a case then, so seriously involving character,

property, and personal liberty, the defendant is entitled to a more specific accusation. The river Muskegon may water, and the county of Ottawa may comprehend a large extent of country, and such averment is no notice to a defendant, as to what particular tract of the lands of the United States, he is called upon to defend. It might as well be "the United States lands" in the county of Ottawa, or the "United States lands in the district of Michigan." No doubt, other lands are held in the county, and at the mouth of the river by individual owners, and so far, such description might generally distinguish the government lands from those entered at private sale. But the patent or deed, to an individual, of government lands, describes his purchase by the well known returns of survey, and the marks on the ground, and that which remains unsold is as well known and as easily ascertained. The defendant therefore should be apprised by the indictment of the particular subdivision to which the alleged offense attaches. It is not a question of jurisdiction that the venue settles, but a matter of essential description.

A part of the statutory definition of the offense: material to be proved, and therefore material to be averred. 1 Stat. 465; 4 Stat. 472; 5 Hill, 401; 3 Blackf. 193; 1 Chit. Pl. 234; Cowper, 682; 3 Greenl. Ev. 12; U. S. v. Wilson [Case No. 16,730]. The case of U. S. v. Wilson [supra] does not conflict with this view. The offense was robbing the U. S. mail in the Eastern district of Pennsylvania. Not necessary to prove and therefore unnecessary to aver particular locality, as essentially connected with the crime. But here the offense is not the destruction or removal of timber on wild land, not merely the removal of timber, belonging to the United States, but the destruction or removal of timber on and from the lands of the United States, and (with reference to prior enactments) from the surveyed lands of the United States.

II. But it is urged by the government, that the description of the offense is of sufficient certainty, because such description is in the very words of the statute. The words of the statute are, "employed in removing any live oak, or red cedar trees, or other timber, from any other lands of the United States." The lands of the United States other than those designated and reserved for naval purposes, constitute the premises from which the timber is removed, being employed in which, comprises the offense defined in the statute. What, then, are the essential words of the statute? Certainly those which signify the act, such as "employed in removing;" also its specific character "other timber," and also the place where the act was done, viz: "on other lands." By following, then, the precise words of the statute, is the offense so described as to apprise the defendant with sufficient certainty of the particular matter with which he is charged? If so, the description is

sufficient, being in the words of the statute. But, if otherwise, if there be obscurity and uncertainty, the description is not sufficient, although the statute is followed in totis verbis. Such is the rule in [U. S. v. Gooding] 12 Wheat. [25 U. S.] 460, the governing case. Mr. Justice Story, who gave the opinion of the court, says: "That where an indictment follows the language of the creative statute, it is as certain as the statute, and in general such certainty is sufficient;" but he further remarks: "There are cases where more particularity is required, either from the obvious intention of the legislature, or from the application of known principles of law. Courts have thought such certainty not unreasonable or inconvenient," but "calculated to put the plea of autre fois acquit, or convict, fairly within the power of the defendant." "The course has been," observes the court, "to leave every class of cases to be decided very much upon its own peculiar circumstances." The case of U. S. v. Mills, 7 Pet. [32 U. S.] 138, does not conflict with this general rule and exception. And those cited from McLean, Mason and Gallison, would not modify, even if considered in conflict. This court takes the law from the supreme court of the United States, and if the point in controversy has been there adjudicated and settled, it is unnecessary to waste time or strength in protracted commentary upon either English or state authorities. "Ita lex scripta est,"—the authority is conclusive,—so is the law, and the "stare decisis" of the supreme court is mandatory. This case then establishes this rule, viz.:—That in statutory offenses the description of the statute is to be followed, except where more particularity is required from its "obvious intention, and the application of known principles of law." Cases may arise,—cases have arisen,—where it would not be safe for the pleader to follow the statute; as for instance, where the statute uses general terms, which manifestly require a specific application, in order legally to charge the particular offense.

Now, what is the obvious intention of the statute of March 2, 1831, providing for the punishment of offenses, committed in cutting, destroying, or removing live-oak and other timber, or trees reserved for naval purposes? Its title and history exhibit its object.—The provisions of the prior statute, exclusively protecting lands reserved from sale for naval purposes, were by this act extended to other lands, and measurably to other timber, than live-oak or red cedar. Protection and preservation of the surveyed landed dominion of the United States—whether north or south, whether growing timber or not;—preservation from spoliation of the surveyed lands, and keeping them, as ordained by Nature, attractive to purchasers, was the sole object and spirit of this amended and extended law. This is obvious from the consideration that the naval reservation and the unsurveyed

lands, are not dedicated either to settlement or sale. Within the territorial limits of the United States, and acquired by treaty from the Indians, the unsurveyed dominions await legislative action, the further fostering care of the government, and the progress of population, in order to be appropriately redeemed from the obscurity and helplessness of the wilderness. Conceived, but not born—in embryo, but not legally in existence, they await the breath of law, to give them legal being and ensure them legal protection. The land law, for the punishment of this description of trespass, does not embrace the unsurveyed tracts of the public land. They may need such legislation, but it is not yet given. When the act of 1831 was passed, the revenue arising from the land sales, formed a prominent item in the treasury, and was an important object of national solicitude. Its annual increase by salutary legislation—holding forth inducements to the settler and purchaser, and its collection, were the leading motives of the land legislation for many years preceding. The government did not seek the preservation of the timber growing on its lands (with the single exception of the naval reservation,) with the motive of enhancing their value for ornament, or special use, or speculation, but singly with the view of inducing speedy sale and settlement, and preserving for the purchaser, at government price, the lands as they stood. If the evil then to be remedied by the statute was the spoliation of the surveyed lands; and the remedy to be applied the preservation, by sufficient penalties, of its valuable timber—if regard is to be had to this manifest intention, certainly, cutting timber on the surveyed United States lands, must necessarily be described with reference to their legal notorious divisions and subdivisions, indicated in statutes pari materia, and of public record. It is true, that cutting timber on lands of the United States is the offense, in the words of the statute. But such description would not indicate on what part of the lands of the United States the trespass was committed. And as the lands of the United States are divided and subdivided—by official surveys and plats—the description required by the statute, and the "application of known principles of law" demand that the indictment should conform to a statutory designation, exhibiting the range, township, section, and quarter section, on which the trespass was committed. This is not inconvenient, certainly. This is not, certainly, unreasonable,—this is certainly calculated to "put the plea of former acquittal or conviction fairly within the power of the defendant." Should the defendant be acquitted, on a charge describing the cutting, or removing, on lands of the United States, at the mouth of a river, in a certain county and district, and be subsequently indicted for the same offense, describing the range, township, section, and quarter section, to what purpose could the record of the first case be evidence? The first description did not necessarily include or cover the latter, and without testimony establishing the fact, it could not be inferred. In the post office case, the offense defined was embezzling and secreting, and not stealing the particular enclosure. The breach of official trust was the offense. The descriptive words of the statute are all that are necessary. The name of the bank, or the genuineness of the note, is only necessary as to corroborative evidence, and may or may not be used in the indictment. The article of value, if stated, is proved by the note taken; but the fact itself is not essential to establish the offense of embezzlement, neither is it necessary to describe the letter by its superscription.

This statute itself, illustrates the point in consideration. For cutting down, or removing naval timber, it would not be sufficient to state merely that the act was on lands of the United States; but on specific and reserved lands. So here; cutting on lands of the United States would embrace the extent of the venue or jurisdiction, and leave the defendant on a wide sea, without chart or compass, to direct him to what particular trespass he must apply his defense. The court considers that the land law of the United States furnishes the chart, and that the government must observe it in these prosecutions.

III. But it is further objected to the sufficiency of this indictment, that it does not describe any offense whatever. The words of the statute are, "being employed in removing timber." In the indictment, the word "timber" is used with a videlicit, explaining it to mean "shingles and shingle-bolts." This explanation is material, for without it, no charge is specially expressed. "Timber" is a generic term. The question then arises as to the interpretation of the word "timber." However the word may be used in common intercourse, or whatever construction has heretofore judicially been given to it, in connection with other legislation, this court will be guided and controlled by the manifest intention of the legislature in its use, and the object of the act of congress. Unless the contrary clearly appears from the context, it will be presumed that the word was employed in its ordinary popular sense. It is not the interpretation of an artistic or technical word, or a word of equivocal meaning. It is a word in common use, and has an enlarged or restricted sense, according to the connection in which it is employed. Keeping in view the spirit of the statute, the evil which it designed to prevent, and the remedy intended, looking to this and other statutes on the same subject, such an interpretation must be given to the word as will effect, and not defeat, the legislative will. As a generic term, it properly signifies, only such trees as are used in building—either ships or dwellings. [U. S. v. Castillero] 2 Black [67 U. S.] 281; 1 Crabbe, Real Prop. § 20; 2 Burrell, Law Dict. tit. "Timber." But its signification is

not limited to trees: it applies to the wood, or the particular form which the tree assumes when no longer growing or standing in the ground. Strictly speaking, a tree is that which is growing or standing in the ground whether alive or dead. There are dead and live trees, both standing. But when the trunk is severed from the root, and felled to the earth, it is no longer, properly speaking, a tree. , It becomes timber or lumber, according to the use to which it can be applied. A forest of standing trees, if they can be appropriated to building, is called well timbered land, but loses that designation, if swept to the earth by a tornado.

The legislature is presumed to be acquainted with the varied use of the word, and to have employed it in the statute, in an enlarged or a restrictive sense, according to its connection with the subject matter; thus, when used in the act of 1817, in the plural number, "red cedar timber," it · signifies "standing or growing trees," and when in the 4th section, (prohibiting its exportation,) it is used in the singular number, "timber," it evidently applies only to the tree cut down, and prepared for transportation in ships. So that in the same act, according to its association, does it bear two different significations; one, enlarged—embracing the trees of the forest, as standing; and the other a restricted, special meaning, applying only to the use to which the wood can be appropriated. And in the act of congress under consideration, the same varied use is made of the word. When the cutting is prohibited, it is synonymous with trees: "Cutting any other timber on—" i. e., felling them to the earth;—when removal is prohibited, removing any other timber "from," it is applicable to the restricted sense of the trees being felled to the earth, and prepared by the labor of man, on the ground where cut for transportation; and where the statute embodies both significations in the phrase "other timber, standing, growing and being." "Standing and growing" mean when alive as trees, erect in the earth; and "being" is applicable to their character, cut and ready for use. That this distinction exists in the statute, and was in the contemplation of the legislature, seems evident from the use of the term in the second section, wherein the timber cut is used with reference to its being taken on board of a vessel. If cut, it was no longer a tree; if to be taken on board of a vessel, it is no longer a tree. Trees are not transported in vessels from place to place; but timber is, and dropping the word tree, in this section, and using the word "timber"— in connection with "red cedar and live oak cut,"—leaves no doubt in my mind, in regard to the legislative use of the word in the first section, prohibiting the being "employed in removing any live oak or red cedar trees or other timber." In this connection it is employed to signify the felled trees, prepared for use and transportation, and embraces the various uses to which timber can be appropriated, either in ship or house building—whether pine logs, square pine timber, or any other form in which the cut trees are prepared, either for the saw mill or transportation. It was not the intention of the act of congress, to punish the removal of any article manufactured from the timber cut upon the public lands; such as masts, bowsprits, oars, breakers, casks, boards, tubs, buckets, barrows or hand-spikes; or, to pursue the felled tree as timber further than such preparation of the wood as was necessary for its transportation to the saw mill, or other place of manufacture. Beyond such purpose the article became transmuted. Its nature and use changed. It was no longer timber. Its character as timber ceased when the labor of the lumberer ceased, and the art of the manufacturer commenced. When the article is once perfected for immediate use, it is only known by its appropriate name; and is no more timber than bread is flour, or flour, wheat, or mutton, sheep,—or beef, oxen;— and such also, are shingles, made of pine timber, because they are perfected by man's art for immediate use. We do not say that a dwelling is timbered, but shingled.

Timber logs or timber bolts are brought from the woodland and converted at the saw mill into boards, or scantling, or laths, or shingles; and the latter has a well known and fixed meaning, known to the legislature, and certainly never meant by their term "timber," in the act of 1831. It is true that "fat oxen" are provision and munitions of war, according to case cited from 2 Peters: there, the genus "provision" covers the species "oxen." But "provision" is not fat oxen—it may consist in something else; and here timber, as a genus, by no means includes a manufactured article, which does not bear to it the relation of a species. Timber is the genus of the various trees dedicated by custom to a particular use—such as the pine, the ash, the oak, the cedar, and the chestnut; but certainly not to the articles manufactured therefrom, or otherwise a frame building might be considered a species of timber. But to make the antecedent terms in the statute limit the word to their specific character as trees, would be unnecessary repetition, and clearly defeat the object in view of inhibiting the principal evil designed to be prevented, viz., the illicit commerce between the cutters and those who traded in timber cut. Such was the object of the act of 1817, and with a like view the provisions of the law were extended to the whole surveyed national domain. The question, then, is not as to the popular meaning of the word, considered as trees growing, or as hewn logs in transitu to the saw mill; but its statutory signification; not its lexicographic, but its signification in the statute, and how it is here legislatively employed. And should such a construction be now given, as to confine the penalty for removal of

trees, as such, the act would defeat itself. If applicable to trees only, the preservation of naval timber so earnestly desired by the government, would be extremely precarious; and if the word is used in its enlarged sense as to naval timber, it must have the same meaning when applied to other lands than naval lands.

But it is further assigned as a cause of demurrer, that more of the counts for removing timber, aver that it was removed from lands on which it was grown and cut down. The charge is that the defendant was employed in removing from lands of the United States. Now, if the indictment contains the proper averment specifying the lands by township, range, section, and quarter section, this statement would clearly indicate the character of the lands from which the timber was removed; and keeping the object of the statute in view, and interpreting the term "lands" as employed in the statute, to refer exclusively to the surveyed national domain, held forth by the government for entry and sale, in contradistinction to other real estate belonging to the general government, such as dockyards and arsenals, we must hold the charge contained in the indictment to be sufficient. Taking timber from the United States arsenal without permission, may or may not be a felony, according to the circumstances which surround the act; but it is not the offense described in this statute. Neither is it necessary to aver in the indictment that the timber was removed from the particular section of the United States lands where it was grown and cut. Such a fact need not be proved, to support the specific accusation that the timber was removed from specific lands. The statute, with a view to preserve the lands from being despoiled, has prohibited not only the cutting down, but the removal. The offenses are distinct. As to the former, such proof is necessarily connected with the cutting; for how could the charge be maintained, without the other fact being established, that the trees were growing or standing when felled? But to remove that which has been already cut down from section to section, and across section lines, either direct to the mill, or to an adjacent stream for floating, is another and a distinct offense, to be established by evidence showing the removal to be from that part of the public domain described. One offender may cut the timber, another may convey it across the section lines to a place of embarkation on the water, and if eventually removed from the United States lands appropriately described, the offense of removal, or being engaged in removing, is fully made out. That the timber was not the timber of the United States is a matter of issue. But as Mr. Justice Story observes in the oft-cited Case of Gooding [12 Wheat. (25 U. S.) 460], the charge is "the

precise language of the statute." "Employed in removing timber from the lands of the United States," communicates to the accused a definite accusation, by which he cannot be misled, and is unequivocally stated, so as to apprise him of the offense charged and what he is to defend. Here the particularity required as to the locus in quo is not necessary; and the ruling of the supreme court in the Case of Gooding is directly applicable.

Another exception is taken to the form of the indictment apparently involving the intention, with which the alleged criminal act was committed. It is not stated in the indictment that the act was knowingly committed. The statute does not require such an averment. If the defendant was employed as charged, he must have known the character in which he acted, and the business about which he was engaged. Besides, the offense described in the 2d section of the law clearly shows the intention of the legislature, that, in the case of freighting a vessel with this timber, the guilty knowledge must be established against the owner or captain; while such proof is not required in the offenses described in the 1st section, but the fact will be presumed, leaving to the defense to rebut such presumption by evidence showing mistake, ignorance of the section lines, and that the trespass was committed under the well-grounded belief that the timber removed was timber removed from other lands than those of the United States. It may be otherwise as to the omission of such terms as would exhibit the unlawfulness of the act, but that point is held under advisement and until further argument, as it is involved in the motion in arrest of judgment in the case of Thompson.

I have thus carefully considered the points presented in the unusually protracted argument as to the validity of these indictments. It is much to be regretted that demurrers were not interposed at an earlier period, before jurors and witnesses were brought to attend this court. Not only would it have been expedient for the interests of the government, but more satisfactory to the court called upon to decide grave questions of law, during the progress of its session, with a jury, and parties, and witnesses awaiting its action. Such should not be the case, and where causes of a criminal character are hereafter continued from one term to another, with the opportunity in the interval of presenting the law involved by demurrer, the court will not permit while a jury is in attendance, the objections to the indictment in this form to be discussed, but will compel defendants to proceed to trial, and reserve for the action of the court, after verdict, all considerations involving the construction of statutes, or the sufficiency of the pleading.

In the case of George Schuler and Paul H. Howard, the demurrer is sustained.